STATE OF VERMONT

| SUPERIOR COURT<br>Vermont Unit | ENVIRONMENTAL DIVISION<br>Docket No. 20-2-14 Vtec |
|---|---|
| Agency of Natural Resources,<br>    Petitioner<br><br>v.<br><br>Ken Davis, d/b/a Davis Contracting Service<br>    Respondent | DECISION ON THE MERITS<br>ON REMAND |

This matter arises out of the alleged failure of Respondent Ken Davis, d/b/a Davis Contracting Service, (Respondent) to follow Acceptable Management Practices (AMPs) in connection with Respondent's logging activities on property in Montgomery, Vermont. In a February 12, 2014 Administrative Order (AO), the Vermont Agency of Natural Resources (ANR) alleges violations of the Vermont water pollution control law, 10 V.S.A. § 1259(a), as a result of Respondent's logging activities. The AO sets out factual allegations describing Respondent's failure to follow AMPs resulting in discharges into waters of the State without a permit. While the AO states that Respondent has since come into compliance and is following all AMPs, ANR seeks administrative penalties for the violations. On February 18, 2014, Respondent requested a hearing with this Court.

Respondent filed a pre-trial "Motion to Dismiss for Lack of Prima Facie Case," which the Court characterized as a motion to dismiss for failure to state a claim upon which relief can be granted, as governed by Vermont Rule of Civil Procedure 12(b)(6). Civil Rule 12(b) does not apply to this Court's review of administrative orders. V.R.E.C.P. 4(a)(3). We gave Respondent some leeway as a self-represented litigant, and considered the merits of his motion under the Court's authority to issue orders for the disposition of legal issues prior to the de novo hearing. V.R.E.C.P. 4(d)(4)(C). In our July 9, 2014 Entry Order we concluded that ANR has alleged sufficient facts to create an issue for trial as to whether Respondent was in violation of the AMPs and whether failure to follow the AMPs resulted in discharges to State waters without a permit. We also noted that Respondent's motion to dismiss rests primarily on an issue he

raises in defense: that the discharges were caused by Hurricane Irene and not Respondent's failure to follow the AMPs. We therefore **DENIED** Respondent's motion to dismiss because Respondent failed to establish sufficient legal grounds for dismissal of this administrative enforcement order.

The Court conducted a multiday merits hearing at the Vermont Superior Court, Costello courthouse in Burlington, Vermont on December 11, 12, and 23, 2014 and January 6, 2015. Appearing at the trial were John Zaikowski, Esq. representing the Agency of Natural Resources and Mr. Davis representing himself.

This Court issued its original Decision on the Merits and accompanying Judgment Order on May 1, 2015. Kenneth Davis, doing business as Davis Contracting Service, appealed this Court's decision to the Vermont Supreme Court. In a January 7, 2016 Entry Order, the Supreme Court affirmed this Court's decision as to the March 2012 violations, and reversed and remanded for additional findings regarding the August 2011 violations.

We again review and consider the evidence presented at trial, and the Court renders the following Findings of Fact and Conclusions of Law. The Findings of Fact within our original May 1 decision remain unchanged; except that we supplement those findings with additional finding number 17. We also enhance finding number 22 and clarify our conclusions in response to the Supreme Court's January 7 Entry Order.

## Findings of Fact

1. Nutting Farm, LLC is the owner of property located at 4159 Vermont Route 16 in Montgomery, Vermont (the Property). The Property is part of the family homestead of Joshua Davidson and is approximately 600 acres.

2. Nutting Farm, LLC retained forester Bruce Butler to serve as the private consulting forester to manage the forestry issues of the Property.

3. Nutting Farm, LLC retained logger Ken Davis, d/b/a Davis Contracting Service to cut pulp and timber at the Property.

4. Ken Davis has worked in the logging industry in Vermont for over 40 years.

5. Ken Davis' record of compliance does not include any prior violations.

6. Surface water from the northern portion of the Property drains to the Pacific Brook.

7. Surface water from the southern portion of the Property drains to the Trout River.

8. County forester Nancy Patch completed a site visit and inspection to the Property in August 2011. Although she observed some AMP non-compliance issues, she did not observe any related discharges to waters of the state.

9. The AMPs are established in a booklet, admitted at trial as Exhibit 69, titled "Acceptable Management Practices for Maintaining Water Quality on Logging Jobs in Vermont." See Code of Vt. Rules 12 020 010, available at http://www.lexisnexis.com/hottopics/ codeofvtrules (describing purpose of AMP booklet and noting that the AMPs "have the force of law"). The Court refers to the AMPs by the number they are given in the AMP booklet.

10. Essex regional AMP forester Matthew Leonard received an anonymous complaint on August 25, 2011 regarding an alleged discharge to the Pacific Brook along Nutting Road. The complaint also noted that there was an active logging operation near the headwaters of Pacific Brook at the end of Nutting Road.

11. Forester Leonard performed a site visit to the Property on September 7, 2011 with forester Butler.

12. On the western side of the Property, a truck road runs in a northerly-southerly direction (Western Truck Road) leading to a landing (West Landing). From this landing a skid trail runs further south along the west side of the Property (Western Skid Trail).

13. Surface water from the area of the Western Truck Road, West Landing, and Western Skid Trail drain to the Trout River.

14. During the September 7, 2011 site visit, at two locations along the Western Truck Road, there were no culverts or other structures at stream crossings (AMP 9). Further south on the Western Truck Road and the Western Skid Trail, there were multiple crossings lacking drainages on the approaches to the crossings (AMP 6) and lacking erosion controls (check dams) in ditches (AMP 7).

15. Within a side skid trail running off of the Western Skid Trail, Forester Leonard observed ruts carrying surface water without water diversions such as broad based dips (AMP 6). This surface water traveled to and beyond the West Landing.

3

16. Sediment was discharged into surface water in the areas of the Western Truck Road, West Landing, and Western Skid Trail, which are the headwaters of the Trout River.

17. The failure to follow AMPs 6, 7, and 9 resulted in the sediment discharge to the surface waters and the headwaters of the Trout River. Stated another way, the AMP violations caused or contributed to the discharge of sediment.

18. Respondent did not have a permit for these discharges.

19. A second large landing is located near the northwest corner of the property (North Landing). A skid trail exits/enters the east end of the North Landing and travels generally parallel to the northern boundary of the Property (North Skid Trail).

20. Surface water within the area around the North Landing and North Skid Trail drains to the Pacific Brook.

21. Two culverts were installed along the North Skid Trial prior to forester Leonard's September 7, 2011 site visit. These culvert installations were non-compliant with AMPs 4, 6, 7 and 11 as follows: the ditches along the skid trail approaching the water crossings terminated directly into the streams rather than being diverted (AMP 4); there were no broad-based dips or water bars approaching the culverts (AMPs 6 and 11); and there were no hay bale erosion check dams or diversions preventing water from entering the streams (AMP 7).

22. The backfill used for culvert installation was sandy material susceptible to erosion. As the backfill around the culverts eroded it discharged directly into the streams and waterways that led to the Pacific Brook. Significant erosion and loss of backfill material was observed on September 7, 2011.

23. Respondent did not have a permit to discharge to the streams or to the Pacific Brook.

24. During the September site visit and compliance inspection, the State provided recommended AMP improvements and suggested remedial measures.

25. Forester Leonard performed a follow-up site visit to the Property on October 28, 2011 and observed that a majority of the recommended AMP improvements were implemented.

26. Forester Leonard received a second complaint of discharges at the lower stretches of the Pacific Brook on March 19, 2012.

27. Forester Leonard performed an additional site visit to the Property with forester Butler on March 23, 2012.

28. A second skid trail exits/enters the east end of the North Landing and travels generally in a southwesterly direction toward the southeast corner of the Property (Central Skid Trail).

29. During forester Leonard's March site visit, significant slash was within a defined stream channel in the northwestern end of the Central Skid Trail (AMP 8).

30. Also toward the northwestern end of the Central Skid Trail, the required protective strip of wooded area was not left in place, but rather trees were harvested right up to the stream bank (AMP 14). Additionally, harvesting equipment was located immediately adjacent to the stream (AMP 14).

31. Further southeast on the Central Skid Trail, there were areas lacking both broad-based dips in the area where the trail approached a stream (AMP 11) and hay bale erosion check dams or water diversions preventing sediment from entering a stream (AMP 7).

32. At approximately the mid-point of the Central Skid Trail, the trail runs immediately adjacent to a stream without a protective strip in non-compliance with AMP 14. This area also lacked broad-based dips in non-compliance with AMP 6. This area had considerable bank erosion and sediment within the stream which is part of the headwaters of the Pacific Brook.

33. Continuing further southeast on the Central Skid Trail, a stretch of a stream was used as a skid trail (AMP 10), logging equipment was used within a protective strip (AMP 14), slash was within the stream channel (AMP 8), a permanent stream was crossed without a culvert or other structure (AMP 9), and there was a lack of broad-based dips in the areas where the trail crossed a stream (AMP 11).

34. Sediment was within the streams and surface water in these areas of the Central Skid Trail.

35. Respondent had no permits for these discharges.

36. County forester Nancy Patch also completed site visits and inspection to the Property in March 2012. Forester Patch observed several AMP non-compliance issues resulting in mud flowing down logging roads and mud accumulating in seeps and streams. Forester Patch also observed a culvert which was washed out. Finally, forester Parch observed a skid road located in the middle of a stream (AMP 10).

37. In early March 2012, Respondent's ongoing logging activities were abruptly halted due to a quick spring thaw with temperatures considerably above freezing.

38. At this time, Respondent ordered his crew to stay off the Property to avoid further ground disturbance to minimize the potential for significant discharges.

39. Sediment and mud flowing into the waters of the state result in impacts of siltation which smothers and kills live stream habitat.

40. The 2011 and 2012 discharges resulted in impacts to water quality, including sedimentation which degraded aquatic habitat and altered the natural hydrology of the surface water flow.

41. The State performed follow-up site visits in May, June, and August 2012. As of August 22, 2012, all compliance issues had been remedied.

42. Mr. Davis and his employees were courteous during ANR's investigations. All remedial work was performed in a sound manner.

43. Forester Patch logged 40 hours for inspection and reports relating to the Property and 4 hours for testimony in court. Her hourly rate is $25/hour resulting in total labor costs of $1,100.

44. Forester Leonard logged 76 hours in completing site visits and inspections, telephone correspondence and participating in trial. His hourly rate is $25.77/hour resulting in total labor costs of $1,958.52.

45. Environmental enforcement officer Ted Cantwell investigated the alleged violations. This included property records research, participation in site visits and inspections, report writing, and trial time for a total of 77 hours. His hourly rate is $31.83/hour, resulting in total labor costs of $2,450.91.

6

**Conclusions of Law**

I.      **Violations**

The Acceptable Management Practices (AMPs) were adopted as rules to Vermont's Water Quality Statutes on August 15, 1987 as methods for the control and dispersal of water collecting on logging roads, skid trails, and log landings and are intended to minimize erosion and reduce sediment and temperature changes in streams. The AMPs must be implemented by landowners or their contracted loggers before, during, and after logging activities. A permit is required to discharge any waste, substance, or material into the waters of the state. 10 V.S.A. §1259(a). Individual permits are not required, however, for discharges caused by logging operations if AMPs are in place. Code of Vt. Rules 12 020 010, available at http://www.lexisnexis.com/hottopics/codeofvtrules. Thus, to find a violation in this matter, there must be a failure to follow the AMPs <u>and</u> an unpermitted discharge.

Respondent raises concerns relating to a lack of evidentiary connection between the Property and the complaints regarding the off-site condition of the Pacific Brook and Trout River. Specifically, Respondent argued that ANR could not prove that the complaints were not a result of some other discharge unrelated to the Property. While we understand Respondent's concern, it is unnecessary for ANR to establish this connection. We focus on the evidence of compliance or lack of compliance with the AMPs on the Property and whether or not there was a related unpermitted discharge on the Property to waters of the state. It is not necessary to trace a discharge to surface waters on the Property all the way to either the Pacific Brook or Trout River. To be clear, at trial ANR acknowledged that it was not intending to prove a discharge off-site. Rather, the complaints of off-site discharges were the reason why ANR inspected the logging activities.

A. <u>Western Truck Road, West Landing, and Western Skid Trail</u>

As set out in the above findings of fact, ANR provided credible evidence of several AMP non-compliance issues in September 2011 along the Western Truck Road, West Landing, and Western Skid Trail. These included the failure to install culverts or other structures where the road crosses a stream (AMP 9), the failure to install an appropriate number of water bars or broad-based dips along the road and skid trail (AMP 6), and the lack of check dams (hay bales)

7

at outlets of water bars entering streams and other surface waters (AMP 7). ANR introduced evidence through testimony and photographs of resulting discharges to the headwater of the Trout River through intermittent streams and seeps stemming from these areas where AMPs were not complied with. These Intermittent streams and seeps generally flow southwesterly to the Trout River and are thus waters of the state.

Respondent offered testimony to rebut the ANR's evidence which explained how the flow of water was diverted in some areas into filter strips, and therefore, did not result in a discharge. ANR countered with additional testimony that the flow of water in the area where filter strips were used was too long of a run prior to diversion, with too much velocity, and that the vegetated filter strip was not sufficient to comply with the AMPs. On the totality of the evidence, we conclude that Respondent failed to comply with required AMPs along the Western Truck Road, West Landing, and Western Skid Trail. Further, we conclude that the failure to follow the AMPs caused the discharge to waters of the state without a permit.

B. Northern Skid Trail

ANR also provided credible evidence of AMP non-compliance issues in September 2011 along the Northern Skid Trail, including ditches that terminated directly into the streams rather than being diverted (AMP 4), the lack broad-based dips or water bars approaching culverts (AMPs 6 and 11), and a lack of hay bale erosion check dams or diversions preventing water from entering the streams (AMP 7). Additionally, ANR introduced evidence that significant erosion of the backfill material around the culverts occurred resulting in discharges to the stream and eventually to the headwaters of the Pacific Brook without a discharge permit. The evidence established that these discharges to waters of the state were caused by the AMP violations. We therefore conclude that the AMP non-compliance issues and related discharges in the area of the Northern Skid Trail to the headwater of the Pacific Brook were violations of 10 V.S.A. § 1259(a).

C. Central Skid Trail

Furthermore, because it is illegal to discharge any waste into the waters of the state, the significant amount of slash within the defined stream channel near the northwestern end of the Central Skid Trail is also a "discharge." 10 V.S.A. § 1259(a) and AMP 8. This is a violation

8

regardless of whether the slash causes erosion or sedimentation. Respondent and his witnesses testified that this slash was cut and dropped under snow cover conditions. AMP practices allow the temporary "brushing-in" of streams during frozen winter conditions provided the slash is removed from the stream channel before spring runoff. The slash was not removed prior to spring runoff. Thus, we conclude that this activity was a violation of 10 V.S.A. § 1259(a).

Respondent testified at trail that he should not be held liable for discharges in August 2011 because Hurricane Irene was the cause of the discharges. We disagree. If Respondent was compliant will all AMPs in August 2011 when Hurricane Irene came through the logging operation and the discharges took place, Respondent would not be found in violation. As stated above, to find a violation, there must be a failure to follow the AMPs and an unpermitted discharge. Although compliance with the AMPs does not guarantee that a discharge will not occur, the AMPs are intended to minimize erosion and reduce sediment and temperature changes in streams to the extent possible. Thus, logging operations can insulate themselves from being held in violation by complying with AMPs regardless of potential discharges to waters of the State. Code of Vt. Rules 12 020 010 ("[A] logger or landowner is liable to legal action only when a discharge takes place and either no permit has been obtained or the AMP's have not been followed. Thus, the AMP's are not only basic to sound forestry; they also legally protect the logger or landowner during and after timber harvesting.").

As observed in March 2012, along the northwestern end of the Central Skid Trail, the required protective strip of a wooded area was not left in place, but rather trees were harvested right up to the stream bank resulting in non-compliance with AMP 14. Additionally, harvesting equipment was located immediately adjacent to the stream. To the southeast along the Central Skid Trail, there were areas lacking broad-based dips in the area where the trail approached a stream (AMP 11) or hay bale erosion check dams or water diversions preventing sediment from entering a stream (AMP7). While the stream in this area is part of the headwaters of the Pacific Brook, the State did not persuade the Court of a nexus between a lack of compliance with AMPs and a discharge in these areas. Although ANR did introduce photographs from these areas showing sediment in the stream, there was no demonstrated

9

connection between the sediment and the failure to follow the AMP. Without this connection, we cannot conclude that a violation of 10 V.S.A. § 1259(a) has occurred in this area.

Also observed in March of 2012, further southeast at approximately the mid-point of the Central Skid Trail, the skid trail was established running immediately adjacent to a stream without a protective strip in non-compliance with AMP 14 and this area lacked broad-based dips in non-compliance with AMP 6. The State provided credible evidence that this area had considerable bank erosion and sediment within the stream which is part of the headwaters of the Pacific Brook. The evidence also demonstrated that the discharge of sediment into the stream was caused by the AMP violations. We therefore conclude that the non-compliance with AMPs and the discharge of sediment to surface waters was a violation of 10 V.S.A. § 1259(a) in this area of the Central Skid Trail.

Continuing further southeast on the Central Skid Trail, a stretch of a stream was observed in March 2012 to be used as a skid trail in non-compliance with AMP 10. Additionally, logging equipment was used within a protective strip in non-compliance with AMP 14, slash was deposited within the stream channel in non-compliance with AMP 8, a permanent stream was crossed without a culvert or other structure in non-compliance with AMP 9, and there was a lack of broad-based dips in the areas where the skid trail crossed streams in non-compliance with AMP 11. The State introduced credible evidence of sediments in these areas to have been discharged to the headwaters of the Pacific Brook. Here too, the evidence established that the discharge of sediment into the stream was caused by the AMP violations. We conclude that the lack of compliance with AMPs and resulting discharges to the headwaters in the southeastern portion of the Central Skid Trail without permits were violations.

Respondent and his witnesses testified and provided documentary evidence that in March 2012, Respondent had ongoing logging activities being conducted pursuant to winter conditions.[1] Respondent abruptly halted his logging activities in March 2012 due to a quick spring thaw and temperatures considerably above freezing. Respondent testified that he ordered his crew to stay off the Property to avoid further ground disturbance increasing the

---

[1] AMPs can be modified to account for winter and summer conditions. Generally, winter logging conditions may require less erosion and sediment controls. One example is "brushing-in" a streamed for crossing rather than installation of a culvert. (See Exhibit 68 at 26).

potential for significant discharges. At trial, Respondent argued that he should not be held responsible for an unexpected and drastic warm up in temperatures and the resulting need for additional measures to fully comply with AMPs. We disagree. While a logging operation may log during winter conditions with fewer AMP measures, operators due so at their own risk because it is a certainty that the seasons will change and warm conditions will arrive requiring the additional AMP measures to protect against erosion and reduce sediment and temperature changes in streams. Thus, logging operations must ensure that appropriate AMPs are always in place.

## II.    **Penalty Assessment**

When this Court determines that an environmental violation alleged by ANR in an administrative order has occurred, we are required to "determine anew the amount of a penalty" that should be assessed against the respondent who sought to challenge the ANR order. 10 V.S.A. § 8012(b)(1), (4). We therefore review the evidence before the Court and determine an appropriate penalty assessment, pursuant to the eight subsections of 10 V.S.A. § 8010(b)(1)–(8).

**Subsection (1)**:  Subsection (1) requires consideration of "the degree of actual or potential impact on public health, safety, welfare and the environment resulting from the violation." Id. Respondents' violations of 10 V.S.A. § 1259(a) had potential adverse impacts on public health, safety, welfare, and the environment, given the number of violations during the two time periods and the amount of material discharged to waters of the State. We impose a penalty of $ 5,000.00. We conclude that such a penalty is warranted and we decline to impose a more significant penalty under this subsection, since details of actual significant impacts on public health, safety, welfare, and the environment were not demonstrated by the evidence presented at trial.

**Subsection (2)**:  Subsection (2) requires consideration of "the presence of mitigating circumstances, including unreasonable delay by the secretary in seeking enforcement." Id. The evidence presented of mitigating factors favoring Respondent includes Respondent fully remediating the logging operation in a prompt fashion. Furthermore, Mr. Davis and his

11

employees were courteous during ANR's investigations and all remedial work was performed in a sound manner.

There is no evidence disfavoring the timeliness of ANR's action. We therefore assess a credit to benefit Mr. Davis for his prompt and complete remediation of $1,000.00.

**Subsection (3)**: Subsection (3) requires consideration of "whether the respondent knew or had reason to know the violation existed." Id. The credible evidence shows that Respondent did not have actual knowledge of the violations of 10 V.S.A. § 1259(a) in advance of ANR's inspections nor any evidence of Respondent having an affirmative intent to avoid compliance with AMPs. There is some evidence that Respondent had reason to know of violations in March 2012 as ongoing logging activities were abruptly halted due to a quick spring thaw and considerably above freezing temperatures. Respondent testified that he ordered his crew to stay off the Property to avoid further ground disturbance increasing the potential for significant discharges. Based upon this evidence, we decline to assess any additional penalty pursuant this subsection as we feel that Respondent exercised his best judgment under the circumstances.

**Subsection (4)**: Subsection (4) requires consideration of "the respondent's record of compliance." Id. The record presented does not show that Respondent had previously violated ANR's regulations. Given the Respondent's number of years working in the logging industry and his clean record of compliance, we decline to assess any additional penalty pursuant this subsection.

**Subsection (5)**: This subsection has been repealed.

**Subsection (6)**: Subsection (6) requires consideration of "the deterrent effect of the penalty." Id. In reviewing the importance of establishing a penalty that will have a deterrent effect upon Respondent, we note that Respondent testified to his respect for Vermont's streams and rivers and desire to reduce potential adverse impacts on public health, safety, welfare, and the environment from his logging operations. We therefore see no need to impose an additional penalty and hope and expect that the penalty in Subsection (1) will be deterrent for Respondent to avoid future violations.

**Subsection (7)**: Subsection (7) requires that we consider "the state's actual cost of enforcement." Id. The value of the time that all ANR officials committed to responding to

12

Respondent's violations, including prosecution of this matter, totals $5,509.43. We direct Respondent to reimburse these costs as an additional penalty for his violations.

**Subsection (8)**: Subsection (8) requires consideration of "the length of time the violation has existed." Id. At the time of trial, the credible evidence showed that Respondent took appropriate and prompt measures to remedy his violations. We therefore impose no additional penalty.

ANR provided evidence on the likely cost avoided by not fully complying with the AMPs in the fall of 2011 and spring of 2012. We understand that Respondent ultimately and fully remedied the compliance issues, and thus, incurred a similar cost of that which was originally avoided. We therefore do not impose any amount of additional penalty relating to cost avoidance.

## Conclusion

For the reasons stated above, we conclude that Respondent Ken Davis failed to follow AMPs which resulted in discharges of material to waters of the State without a permit. For the above violations, Ken Davis shall be liable for a total penalty in these proceedings of **$9,509.43.**

## Rights of Appeal (10 V.S.A. § 8012(c)(4)–(c)(5))

This Decision and the accompanying Judgment Order will become final if no appeal is requested within 10 days of the date this Decision is received. All parties to this proceeding have a right to appeal this Decision and Judgment Order. The procedures for requesting an appeal are found in the Vermont Rules of Appellate Procedure (V.R.A.P.) subject to superseding provisions in Vermont Rule for Environmental Court Proceedings (V.R.E.C.P.) 4(d)(6). Within 10 days of the receipt of this Order, any party seeking to file an appeal must file the notice of appeal with the Clerk of the Environmental Division of the Vermont Superior Court, together with the applicable filing fee. Questions may be addressed to the Clerk of the Vermont Supreme Court, 111 State Street, Montpelier, VT 05609-0801, (802) 828-3276. An appeal to the Supreme Court operates as a stay of payment of a penalty, but does not stay any other aspect of an order issued by this Court. 10 V.S.A. § 8013(d). A party may petition the Supreme Court

13

for a stay under the provisions of the Vermont Rules of Civil Procedure (V.R.C.P.) 62 and V.R.A.P. 8.

A Judgment Order accompanies this Decision. This concludes the current proceedings before this Court.

Electronically signed on March 2, 2015 at 9:00 AM pursuant to V.R.E.F. 7(d).

_____
Thomas G. Walsh, Judge
Superior Court, Environmental Division